Receipt # 082252

ORIGINAL



1 Terri Ann Tate
2 38658 Mystic Court
3 Farmington Hills MI 48331

4 UNITED STATES DISTRICT COURT
5 EASTERN DISTRICT OF MICHIGAN

**Terri Ann Tate**

**Plaintiff,**

vs.

**BAC Home Loan Servicing, LP**

**Defendant**

Case "

Case:2:10-cv-13257
Judge: Lawson, David M.
MJ: Hluchaniuk, Michael
Filed: 08-17-2010 At 02:48 PM
CMP TATE V BAC HOME LOAN SERVICING
LP (EB)

6

7 Date: _____

8 Comes now Terri Ann Tate , hereinafter referred to as "Petitioner," and moves the court for
9 relief as herein requested:

10 **PARTIES**

11 Petitioner is Terri Ann Tate , 38658 Mystic Court Farmington Hills MI48331. Currently
12 Known Defendant(s) are/is: BAC Home Loan Servicing, LP , 450 American Street , CA
13 93065, by and through its attorney .

14 **STATEMENT OF CAUSE**

15 Petitioner, entered into a consumer contract for the refinance of a primary residence located at
16 38658 Mystic Court Farmington Hills MI48331, hereinafter referred to as the "property."

17 Defendants, acting in concert and collusion with others, induced Petitioner to enter into a
18 predatory loan agreement with Defendant.

19 Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully
20 crafted scheme intended to defraud Petitioner.

21 Defendants failed to make proper notices to Petitioner that would have given Petitioner warning
22 of the types of tactics used by Defendants to defraud Petitioner.

23 Defendants charged false fees to Petitioner at settlement.

ORIGINAL PETITION

24 Defendants used the above referenced false fees to compensate agents of Petitioner in order to

25 induce said agents to breach their fiduciary duty to Petitioner.

26 Defendant's attorney caused to be initiated collection procedures, knowing said collection

27 procedures in the instant action were frivolous as lender is estopped from collection procedures,

28 under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for

29 the production of the original promissory note alleged to create a debt.

30                                    **IN BRIEF**

31                          *(Non-factual Statement of Posture and Position)*

32   It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be

33 making a number of allegations that, outside the context of the current condition of the real

34 estate industry, may seem somewhat outrageous and counter-intuitive.

35 When Petitioner accuses ordinary individuals of acting in concert and collusion with an

36 ongoing criminal conspiracy, it tends to trigger an incredulous response as it is

37 unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary

38 people, just doing what they have been trained to do, are out to swindle the poor

39 unsuspecting borrower.

40 The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud

41 committed by people acting in concert and collusion, one with the other.  Petitioner has no

42 reason to believe that the Agent, loan officer, appraiser, and others were consciously aware

43 that what they were doing was part of an ongoing criminal conspiracy, only that it was,

44 and they, at the very least, kept themselves negligently uninformed of the wrongs they

45 were perpetrating.  Petitioner maintains the real culprit is the system itself, including the

46 courts, for failure to strictly enforce the consumer protection laws.

47                      **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**

48                          *(General State of the Real Estate Industry)*

49      ***THE BEST OF INTENTIONS***

50 Prior to the 1980's and 1990's ample government protections were in place to protect

51 consumers and the lending industry from precisely the disaster we now experience.

52 During President Clinton's administration, under the guise of making housing available to

ORIGINAL PETITION                                                        2 of 24

53   the poor, primary protections were relaxed which had the effect of releasing <u>the</u>
54   <u>unscrupulous on the unwary.</u>

55   <u>Prior to deregulation in the 1980's, lenders created loans for which they held and assumed</u>
56   <u>the risk.</u>  Consequently, Americans were engaged in safe and stable home mortgages.
57   With the protections removed, the <u>unscrupulous lenders</u> swooped in and, instead of
58   making loans available to the poor, used the opportunity to convince the unsophisticated
59   American public to do something that had been <u>traditionally</u> taboo; home <u>buyers</u> were
60   convinced to speculate with their homes, <u>their most important investment</u>.

61    BAC Home Loan Servicing, LP , Ameriquest, Countrywide, and many others swooped in
62   and convinced Americans to sell their homes, get out of the<u>ir</u> safe mortgage agreements,
63   and speculate with the equity <u>they had gained</u> by purchasing homes they could not afford.
64   Lenders created loans intended to fail as, under the newly crafted system, the Lender
65   profited more from a mortgage default than from a stable loan.

66   Companies cropped up who called themselves banks when, in fact, they were only either
67   subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
68   creating and selling promissory notes.  As will be demonstrated, these companies then
69   profited from the failure of the underlying loans.

70       *HOW IT WORKS*

71   Briefly, how it works is this, the Lender would secure a large loan from a large bank,
72   convert that loan into 20 and 30 year mortgages <u>and</u> then sell the promise to pay to an
73   investor.

74   People would set up mortgage companies buy securing a large loan from one of the major
75   banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this
76   an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
77   lender who would secure the title from the seller using the <u>borrowed bank</u> funds for that
78   <u>purpose, and then</u> trade the title to the buyer in exchange for a promissory note.

79   The lender then <u>creates a</u> 20 or 30 year mortgage with money the lender must repay within
80   6 months.  As soon as the closing is consummated, the promissory note is sold to an
81   investor pool.

82   Using the instant case as an example, a 408,000.00 note at 7.6900%  interest over 30 years
83   will produce $517,832.09  The lender can then offer <u>to the investor</u> the security instrument

ORIGINAL PETITION                                                      3 of 24

84    (promissory note) at say 50% of it's future value.  The investor will, over the life of the
85    note, less approximately 3.00% servicing fees, realize $511,315.02 .  The lender can then
86    pay back the bank and retain a handsome profit in the amount of $134,942.76.  The lender,
87    however, is not done with the deal.

88    The lender signed over the promissory note to the investor at the time of the trade, but did
89    not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supreme
90    Court addressed this issue and stated that such a transaction was certainly legal.  However,
91    it created a fatal flaw as the holder of the lien document, at time of sale of the security
92    instrument, received consideration in excess of the lien amount.  Since the lien holder
93    received consideration, he could not be harmed.    Therefore the lien became an
94    unenforceable document.

95    This begs the question: if keeping the lien would render it void, why would the lender not
96    simply transfer the lien with the promissory note?  The reason is because the lender will
97    hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
98    amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
99    liability.  The lender, by this maneuver, gets consideration a second time.  And still the
100   lender is not done profiting from the deal.

101   After sale of the promissory note, the lender remains as the servicer for the investor.  The
102   lender will receive 3% of each payment the lender collects and renders to the investor
103   pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and keep
104   that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling the
105   foreclosure.

106   The lender stands to profit more from a note that is overly expensive, than from a good
107   stable loan.  And where, you may ask, does all this profit come from?  It comes from the
108   equity the borrower had built up in the home.  And still the lender is not finished profiting
109   from the deal.

110   Another nail was driven in the American financial coffin when on the last day Congress
111   was in session in 2000 when restrictions that had been in place since the economic
112   collapse of 1907 were removed.  Until 1907  investors were allowed to bet on stocks
113   without actually buying them.  This unbridled speculation led directly to an economic
114   collapse. As a result the legislature banned the practice, until the year 2000.  In 2000 the
115   unscrupulous lenders got their way on the last day of the congressional session.  Congress

ORIGINAL PETITION                                                                            4 of 24

116   removed the restriction banning derivatives and again allowed the practice, this time
117   taking only 8 years to crash the stock market.   This practice allowed the lender to profit
118   further from the loan by betting on the failure of the security instrument he had just sold to
119   the unwary investor, thus furthering the purpose of the lender to profit from both the
120   borrower (consumer) and the investor.

121   The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
122   bailout at the expense of the taxpayer.   The unsuspecting consumer was lulled into
123   accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
124   were acting under the guise of government regulation and, therefore, the borrower had
125   reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to
126   protect the consumer from just this kind of abuse were simply being ignored.

127   The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
128   the referral of the client to the lender by a person acting as an agent for the borrower.
129   Hereinafter, the person or entity who receives any portion of the yield spread premium, or
130   a commission of any kind consequent to securing the loan agreement through from the
131   borrower will be referred to as "Agent." The fee, authorized by the consumer protection
132   law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
133   seeking out a lender for the borrower, would seek the best deal for his client rather than
134   who would pay him the most.  That was the intent, but not the reality.  The reality is that
135   Agents never come away from the table with less than 2% or 3% of the principal.  This is
136   accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
137   fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
138   product than the borrower qualifies for.  This will generate more profits for the lender and,
139   consequently, for the Agent.

140   It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
141   the fair market price.  This allows the lender to increase the cost of the loan product and
142   give the impression that the borrower is justified in making the purchase.

143   The lender then charges the borrower an underwriting fee in order to convince the
144   borrower that someone with knowledge has gone over the conditions of the note and
145   certified that they meet all legal criteria.  The trustee, at closing, participates actively in the
146   deception of the borrower by placing undue stress on the borrower to sign the large stack
147   of paperwork without reading it.  The trustee is, after all, to be trusted and has been paid to

ORIGINAL PETITION                                                                                    5 of 24

148    insure the transaction. This trust is systematically violated for the purpose of taking unfair

149    advantage of the borrower. The entire loan process is a carefully crafted contrive

150    connivance designed and intended to induce the unsophisticated borrower into accepting a

151    loan product that is beyond the borrowers means to repay. With all this, it should be a

152    surprise to no one that this country is having a real estate crisis.

153    **PETITIONER WILL PROVE THE FOLLOWING**

154    Petitioner is prepared to prove, by a preponderance of evidence that:

155    • Lender has no legal standing to bring collection or foreclosure claims against the
156        property;

157    • Lender is not a real party in interest in any contract which can claim a collateral
158        interest in the property;

159    • even if Lender were to prove up a contract to which Lender had standing to enforce
160        against Petitioner, no valid lien exists which would give Lender a claim against the
161        property;

162    • even if Lender were to prove up a contract to which Lender had standing to enforce
163        against Petitioner, said contract was fraudulent in its creation as endorsement was
164        secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
165        the inducement, fraud in the execution, usury, and breaches of contractual and
166        fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
167        Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
168        Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
169        "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
170        'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
171        bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
172        pooled together in a trust fund;

173    • Defendants have concocted a carefully crafted connivance wherein Lender
174        conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
175        by inducing Plaintiff to enter into a predatory loan inflated loan product;

176    • Lender received unjust enrichment in the amount of 5% of each payment made late
177        to Lender while Lender and Lender's assigns acted as servicer of the note;

ORIGINAL PETITION                        **6 of 24**

178 • Lender and Lender's assigns, who acted as servicer in place <u>of</u> Lender, profited by

179 handling the foreclosure process on a contract Lender designed to h<u>ave a high</u>

180 <u>probability of default;</u>

181 • Lender intended to defraud Investor by converting the promissory note into a

182 security instrument and selling same to Investor;

183 • Lender intended to defraud Investor and the taxpayers of the United States by

184 withholding the lien document from the sale of the promissory note in order that

185 Lender could then hold the lien for three years, then prepare and file Internal

186 Revenue Form 1099a and falsely claim the full lien amount as abandoned funds

187 and deduct same from Lender's income tax obligation;

188 • Lender defrauded backers of derivatives by betting on the failure of the promissory

189 note the lender designed to default;

190 • participant Defendants, et al, in the securitization scheme described herein have

191 devised business plans to reap millions of dollars in profits at the expense of

192 Petitioner and others similarly situated.

193 **PETITIONER SEEKS REMEDY**

194 In addition to seeking compensatory, consequential and other damages, Petitioner seeks

195 declaratory relief as to what (if any) party, entity or individual or group thereof is the

196 owner of the promissory note executed at the time of the loan closing, and whether the

197 Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory

198 Injunction requiring re-conveyance of the subject property to the Petitioner or, in the

199 alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

200 ***PETITIONER HAS BEEN HARMED***

201 Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

202 Such harm and detriment includes economic and non-economic damages, and injuries to

203 Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

204 In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the

205 equitable relief requested herein is granted.

ORIGINAL PETITION                                                                7 of 24

206                                    **STATEMENT OF CLAIM**

207            ***DEFENDANTS  LACK STANDING***

208                    **No evidence of Contractual Obligation**

209     Defendants claim a controversy based on a contractual violation by Petitioner but have failed to

210     produce said contract.  Even if Defendants produced evidence of the existence of said contract in

211     the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence

212     that a contract actually existed at one point in time.  A copy, considering the present state of

213     technology, could be easily altered.  As Lender only created one original and that original was

214     left in the custody of Lender, it was imperative that Lender protect said instrument.

215     In as much as the Lender is required to present the original on demand of Petitioner, there can be

216     no presumption of regularity when the original is not so produced.   In as much as Lender has

217     refused Petitioner's request of the chain of custody of the security instrument in question by

218     refusing to identify all current and past real parties in interest, there is no way to follow said

219     chain of custody to insure, by verified testimony, that no alterations to the original provisions in

220     the contract have been made.   Therefore, the alleged copy of the original is only hearsay

221     evidence that an original document at one time existed.   Petitioner maintains that, absent

222     production of admissible evidence of a contractual obligation on the part of Petitioner,

223     Defendants are without standing to invoke the subject matter jurisdiction of the court.

224                    **No Proper Evidence of Agency**

225     Defendants claim agency to represent the principal in a contractual agreement involving

226     Petitioner, however, Defendants have failed to provide any evidence of said agency other than a

227     pronouncement that agency has been assigned by some person, the true identity and capacity of

228     whom has not been established.  Defendants can hardly claim to be agents of a principal then

229     refuse to identify said principal.  All claims of agency are made from the mouth of the agent with

230     no attempt to provide admissible evidence from the principal.

231     Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the

232     court.

ORIGINAL PETITION                                                                    **8 of 24**

233    **Special Purpose Vehicle**

234    Since the entity now claiming agency to represent the holder of the security instrument is not the

235    original lender, Petitioner has reason to believe that the promissory note, upon consummation of

236    the contract, was converted to a security and sold into a special purpose vehicle and now resides

237    in a Real Estate Mortgage Investment Conduit (REMIC)    as defined by the Internal Revenue

238    Code and as such, cannot be removed from the REMIC as such would be a prohibited

239    transaction.    If the mortgage was part of a special purpose vehicle and was removed on

240    consideration of foreclosure, the real party in interest would necessarily be the trustee of the

241    special purpose vehicle.  Nothing in the pleadings of Defendants indicates the existence of a

242    special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner

243    cause to believe defendant is not the proper agent of the real party in interest.

244    *CRIMINAL CONSPIRACY AND THEFT*

245    Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward

246    a criminal conspiracy to defraud Petitioner.  Said conspiracy but are not limited to acts of

247    negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous

248    acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to

249    Petitioner by Lender, which were then used to fund the improper payment of commission fees to

250    Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

251    *AGENT PRACTICED UP-SELLING*

252    By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.  In so

253    doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact

254    that Agent was licensed by the state.  Agent further defrauded Petitioner by failing to disclose

255    Agent's conspiratorial relationship to Lender,   Agent violated Agent's fiduciary duty to

256    Petitioner and the duty to provide fair and honest services, through a series of carefully crafted

257    connivances, wherein Agent proactively made knowingly false and misleading statements of

258    alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead

259    Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of

260    a loan product offered by the Lender.  Said loan product was more expensive than Petitioner

261    could legally afford. Agent acted with full knowledge that Petitioner would have made a

262    different decision had Agent given complete disclosure.

ORIGINAL PETITION                                                                9 of 24

263    ***FRAUDULENT INDUCEMENT***

264    Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
265    known, Petitioner could not afford in order to unjustly enrich Lender.

266    ***EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT***

267    Said more expensive loan product was calculated to produce a higher return when sold as a
268    security to an investor who was already waiting to purchase the loan as soon as it could be
269    consummated.

270    **Extra Commission for Late Payments**

271    Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
272    that Lender intended Petitioner would have difficulty paying. The industry standard payment to
273    the servicer for servicing a mortgage note is 3% of the amount collected. However, if the
274    borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
275    Thereby, the Lender stands to receive more than double the regular commission on collections if
276    the borrower pays late.

277    **Extra Income for Handling Foreclosure**

278    Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
279    on which Lender intended petitioner to default. In case of default, the Lender, acting as servicer,
280    receives considerable funds for handling and executing the foreclosure process.

281    **Credit Default Swap Gambling**

282    Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
283    default swap, commonly referred to as a derivative as addressed more fully below. Since Lender
284    designed the loan to fail, betting on said failure is essentially a sure thing.

285    ***LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN***

286    Lender sold the security instrument after closing and received consideration in an amount in
287    excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the
288    security instrument, Lender separated the lien from said security instrument, creating a fatal and
289    irreparable flaw.

ORIGINAL PETITION                                          10 of 24

290   When Lender received consideration while still holding the lien and said consideration was in
291   excess of the amount of the lien, Lender was in a position such that he could not be harmed and
292   could not gain standing to enforce the lien. The lien was, thereby, rendered void.

293   Since the separation of the lien from the security instrument creates such a considerable concern,
294   said separation certainly begs a question: "Why would the Lender retain the lien when selling the
295   security instrument?"

296   When you follow the money the answer is clear. The Lender will hold the lien for three years,
297   then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
298   the full amount from Lender's tax liability, thereby, receiving consideration a second time.

299   Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
300   lien to the holder of the security, however, the lien once satisfied, does not gain authority just
301   because the holder, after receiving consideration, decides to transfer it to someone else.

302   ***LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES***

303   Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
304   information that Lender had as a result of creating the faulty loans sure to default. Lender was
305   then free to invest on the bet that said loan would default and stood to receive unjust enrichment
306   a third time. This credit default swap derivative market scheme is almost totally responsible for
307   the stock market disaster we now experience as it was responsible for the stock market crash in
308   1907.

309   ***LENDER CHARGED FALSE FEES***

310   Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
311   Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
312   vendor.

313   Lender charged other fees that were a normal part of doing business and should have been
314   included in the finance charge.

315   Below is a listing of the fees charged at settlement. Neither at settlement, nor at any other time
316   did Lender or Trustee provide documentation to show that the fees herein listed were valid,
317   necessary, reasonable, and proper to charge Petitioner.

ORIGINAL PETITION                                              11 of 24

| 803 | Appraisal | $510.00 |
| 804 | Credit Report | $18.00 |
| 808 | Tax Service Fee | $90.00 |
| 810 | Flood Cert Fee | $26.00 |
| 811 | Processing Fee | $553.00 |
| 813 | Broker Credit Report | $8.98 |
| 814 | Broker App Fee | $750.00 |
| 815 | Yield Spread Premium | $1,020.00 |
| 816 | Lender Processing Fee | $550.00 |
| 901 | Interest | $419.20 |
| 1101 | Settlement fee | $400.00 |
| 1106 | Notary Fees | $175.00 |
| 1108 | Title insurance | $1,277.00 |
| 1112 | Title Company Processing Fee | $100.00 |
| 1113 | Title company wire fee | $45.00 |
| 1201 | Recording Fee | $94.00 |

318    Debtor is unable to determine whether or not the above fees are valid in accordance with the

319    restrictions provided by the various consumer protection laws.  Therefore, please provide; a

320    complete billing from each vendor who provided the above listed services; the complete contact

321    information for each vendor who provided a billed service; clearly stipulate as to the specific

322    service performed; a showing that said service was necessary; a showing that the cost of said

323    service is reasonable; a showing of why said service is not a regular cost of doing business that

324    should rightly be included in the finance charge.

325    The above charges are hereby disputed and deemed unreasonable until such time as said charges

326    have been demonstrated to be reasonable, necessary, and in accordance with the limitations and

327    restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

328    In the event lender fails to properly document the above charges, borrower will consider same as

329    false charges.  The effect of the above amounts that borrower would pay over the life of the note

330    will be an overpayment of $128,425.69  This amount will be reduced by the amount of items

331    above when said items are fully documented.

332    ***RESPA PENALTY***

333    From a cursory examination of the records, with the few available, the apparent RESPA

334    violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In

335    Lending Statement not within limits compared to Note, Truth in Lending Statement not timely

336    presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,

337    No 1st Payment Letter.

ORIGINAL PETITION                                                                                    12 of 24

338    The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
339    Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
340    statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
341    disclosure letter; loan discount fee disclosure; business insurance company arrangement
342    disclosure; notice of right to rescind.

343    The courts have held that the borrower does not have to show harm to claim a violation of the
344    Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance.  And,
345    in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
346    no more than two thousand, considering the large number enumerated here, it is reasonable to
347    consider that the court will assess the maximum amount for each violation.

348    Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
349    the note, borrower has calculated that, the number of violations found in a cursory examination
350    of the note, if deducted from the principal, would result in an overpayment on the part of the
351    borrower, over the life of the note, of $284,154.93.

352    If the violation penalty amounts for each of the unsupported fees listed above are included, the
353    amount by which the borrower would be defrauded is $294,258.85

354    Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
355    variance, it appears that lender intended to defraud borrower in the amount of $759,522.67

356    ***LENDER CONSPIRED WITH APPRAISER***

357    Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
358    purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
359    duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
360    inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
361    Petitioner.

362    ***LENDER CONSPIRED WITH TRUSTEE***

363    Lender conspired with the trust Agent at closing to create a condition of stress for the specific
364    purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
365    fully understand what was being signed.

366   The above referenced closing procedure was a carefully crafted connivance, designed and
367   intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
368   to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
369   did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
370   as required by various consumer protection statutes.

371   ### *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

372   In the manner in which Defendants have carried on their business enterprises, they have engaged
373   in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
374   (Deceptive Practices Act).

375   Such conduct comprises a pattern of business activity within the meaning of such statutes, and
376   has directly and proximately caused Petitioner to suffer economic and non-economic harm and
377   detriment in an amount to be shown according to proof at trial of this matter.

378   ### *EQUITABLE TOLLING FOR TILA AND RESPA*

379   The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
380   Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

381   Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
382   *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
383   are subject to a one-year limitations period; however, such claims are subject to the equitable
384   tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
385   subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
386   that given the remedial purpose of TILA, the limitations period should run from the date of
387   consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
388   circumstances, suspend the limitations period until the borrower discovers or has reasonable
389   opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
390   *v. California, 784 F.2d 910, 915 9t*h Cir. 1986).

391   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
392   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
393   that such limitations period may be equitably tolled. The Court of Appeals for the District of
394   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*

ORIGINAL PETITION                                                                    14 of 24

395   *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986)*, while the Seventh Circuit came to the
396   opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
397   *Cir. 1997)*. District courts have largely come down on the side of the Seventh Circuit in holding
398   that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
399   *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
400   *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988)*. Importantly, the Ninth Circuit, as noted above, has
401   interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
402   language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
403   of precedential value, this Court has previously found both the TILA and **RESPA** limitations
404   periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
405   *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

406   The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
407   by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
408   existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
409   *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
410   Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
411   any wrongful conduct by the Defendants. Santa Maria. at 1178.

412   ### *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
413   ### *STANDARDS*

414   Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
415   assets by, for example, providing W-2 statements, tax returns, bank statements, documents
416   evidencing title, employment information, and other information and documentation that could
417   be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
418   ability to repay a particular loan over both the short and long term. Defendants deviated from and
419   disregarded these standards, particularly with regard to its riskier and more profitable loan
420   products.

421   **Low-Documentation/No-Documentation Loans.**

422   Driven by its desire for market share and a perceived need to maintain competitiveness with the
423   likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
424   documentation loan products, including the HARMs and HELOCs described hereinabove, and
425   began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to

ORIGINAL PETITION                                                                          15 of 24

426   the already eased underwriting standards to the point of disregarding such standards. This
427   quickened the loan origination process, allowing for the generation of more and more loans
428   which could then be resold and/or securitized in the secondary market.

429   Defendants marketed no-documentation/low-documentation loan programs that included
430   HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
431   income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
432   confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
433   was to be roughly consistent with incomes in the types of jobs in which the borrower was
434   employed. When borrowers were requested to document their income, they were able to do so
435   through information that was less reliable than in a full-documentation loan.

436   For stated income loans, it became standard practice for loan processors, loan officers and
437   underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
438   income loans, emphasizing loan origination from a profitability standpoint at the expense of
439   determining the ability of the borrower to repay the loan from an underwriting standpoint,
440   encouraged the overstating and/or fabrication of income.

441   **Easing of Underwriting Standards**

442   In order to produce more loans that could be resold in the secondary mortgage market,
443   Defendants also relaxed, and often disregarded, traditional underwriting standards used to
444   separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
445   the base FICO score needed for a SISA loan.

446   Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
447   used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
448   loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
449   income ratios (the amount of monthly income compared to monthly debt service payments and
450   other monthly payment obligations.

451   With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
452   term financial circumstances, approving the loan based on the initial fixed rate without taking
453   into account whether the borrower could afford the substantially higher payment that would
454   inevitably be required during the remaining term of the loan.

ORIGINAL PETITION                                                                16 of 24

455    With respect to HELOCs, Defendants underwrote and approved such loans based only on the
456    borrower's ability to afford the interest-only payment during the initial draw period of the loan,
457    rather than on the borrower's ability to afford the subsequent, fully amortized principal and
458    interest payments.

459    As Defendants pushed to expand market share, they eased other basic underwriting standards.
460    For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
461    allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
462    eased underwriting standards the Defendants also were encouraging consumers to go further into
463    debt in order to supply the very lucrative aftermarket of mortgage backed securities.  The relaxed
464    underwriting standards created the aftermarket supply they needed. As a result, the Defendants
465    made it easy for the unwary consumer to take on more debt than he could afford by encouraging
466    unsound financial practices, all the while knowing defaults would occur more and more
467    frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
468    standards.

469    Defendants knew, or in the exercise of reasonable care should have known, from its own
470    underwriting guidelines industry standards that it was accumulating and selling/reselling risky
471    loans that were likely to end up in default. However, as the pressure mounted to increase market
472    share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
473    underwriting guidelines. Such was the environment that loan officers and underwriters were,
474    from time to time, placed in the position of having to justify why they did not approve a loan that
475    failed to meet underwriting criteria.

476    **Risk Layering**

477    Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
478    loans with one or more relaxed underwriting standards.

479    Defendants knew, or in the exercise of reasonable care should have known, that layered risk
480    would increase the likelihood of default. Among the risk layering Defendants engaged in were
481    approving HARM loans with little to no down payment, little to no documentation, and high
482    DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
483    the loans it promoted to borrowers.

484    Loan officers and mortgage Agents aided and abetted this scheme by working closely with other

485    mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to

486    believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did

487    business ignored basic established underwriting standards and acted to mislead the borrower, all

488    to the detriment of the borrower and the consumer of loan products..

489    Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,

490    engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the

491    business practices described above in paragraphs 30-42 of this Complaint

492    ***UNJUST ENRICHMENT***

493    Petitioner is informed and believes that each and all of the Defendants received a benefit at

494    Petitioner's expense, including but not limited to the following: To the Agent, commissions,

495    yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to

496    be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,

497    surcharges and other "back end" payments in amounts to be proved at trial; To the investors,

498    resale premiums, and high rates of return; To the servicers including EMS, servicing fees,

499    percentages of payment proceeds, charges, and other "back end" payments in amounts to be

500    proved at trial; To all participants, the expectation of future revenues from charges, penalties and

501    fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

502    By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,

503    and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly

504    deprived, and is entitled to restitution in the amount of $759,522.67

505    ***CLAIM TO QUIET TITLE.***

506    Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and

507    the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title

508    interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission

509    and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

510    Defendants have no title, estate, lien, or interest in the Subject Property in that the purported

511    power of sale contained in the Deed of Trust is of no force or effect because Defendants' security

512    interest in the Subject Property has been rendered void and that the Defendants are not the holder

ORIGINAL PETITION                                           18 of 24

513  in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'

514  involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

515  "a Petitioner is entitled to damages from those Defendants who concur in the tortuous

516  scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*

517  *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*

518  *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*

519  *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*

520  *Rptr. 2d 752 (2d Dist. 1995).*

521  **SUFFICIENCY OF PLEADING**

522  Petitioner has sufficiently pled that relief can be granted on each and every one of the

523  Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond

524  doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would

525  entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All

526  allegations of material fact in the complaint are taken as true and construed in the light most

527  favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

528  Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.

529  8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal

530  theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*

531  *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal

532  conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court

533  should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,

534  Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of

535  their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,

536  relief as requested herein should be granted.

537  **CAUSES OF ACTION**

538  **BREACH OF FIDUCIARY DUTY**

539  Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary

540  duty of care with respect to the mortgage loan transactions and related title activities involving

541  the Trust Property.

542   Defendants breached their duties to Petitioner by, *inter alia*, the conduct described above. Such
543   breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
544   all applicable laws governing the loan transactions in which they were involved, including but
545   not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

546   Defendant's breaches of said duties were a direct and proximate cause of economic and non-
547   economic harm and detriment to Petitioner(s).

548   Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
549   all to be shown according to proof at trial of this matter.

550   ***CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE***

551   Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
552   duty to properly perform due diligence as to the loans and related transactional issues described
553   hereinabove.

554   In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
555   X and Z promulgated there under to, among other things, provide proper disclosures concerning
556   the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
557   or should have known that borrowers could not afford or maintain, and to avoid paying undue
558   compensation such as "yield spread premiums" to mortgage Agents and loan officers.

559   Defendants knew or in the exercise of reasonable care should have known, that the loan
560   transactions involving Petitioner and other persons similarly situated were defective, unlawful,
561   violative of federal and state laws and regulations, and would subject Petitioner to economic and
562   non-economic harm and other detriment.

563   Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
564   Z promulgated there under were intended and designed to protect, and the conduct alleged
565   against Defendants is the type of conduct and harm which the referenced statutes and regulations
566   were designed to deter.

567   As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
568   non-economic harm in an amount to be shown according to proof at trial.

ORIGINAL PETITION                                                        20 of 24

569    ***AGENT: COMMON LAW FRAUD***

570    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
571    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
572    ground for believing them to be true.

573    Agents made these representations with the intention of inducing Petitioner to act in reliance on
574    these representations in the manner hereafter alleged, or with the expectation that Petitioner
575    would so act.

576    Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
577    in their negligent misrepresentation, and that various Agents were negligent in not implementing
578    procedures such as underwriting standards oversight that would have prevented various Agents
579    from facilitating the irresponsible and wrongful misrepresentations of various Agents to
580    Defendants.

581    Petitioner is informed and believes that Agent acted in concert and collusion with others named
582    herein in promulgating false representations to cause Petitioner to enter into the LOAN without
583    knowledge or understanding of the terms thereof.

584    As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
585    Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
586    opportunities, attorney fees and costs, and other damages to be determined at trial. As a
587    proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has
588    suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
589    mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
590    at trial.

591    ***PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED***
592    ***COVENANT OF GOOD FAITH AND FAIR DEALING.***

593    Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
594    fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
595    performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
596    *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*

597   *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
598   *Jones, (2004) 33 Cal. 4th 917,* the court stated:

599   In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
600   particular significance, in part because of the special relationship between the insurer and the
601   insured. The insurer, when determining whether to settle a claim, must give at least as much
602   consideration to the welfare of its insured as it gives to its own interests. . . The standard is
603   premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

604   Likewise, there is a special relationship between an Agent and borrower. "A person who
605   provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
606   otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
607   consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
608   be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
609   *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
610   *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
611   (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
612   [*Emphasis Added*].

613   All Defendants, willfully breached their implied covenant of good faith and fair dealing with
614   Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
615   provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
616   product without regard for other more affordable products; (4) Placed Petitioner into a loan
617   without following proper underwriting standards; (5) Failed to disclose to Petitioner that
618   Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
619   valid and /or properly documented substitutions and assignments so that Petitioner could
620   ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
621   request for documentation of the servicing of Petitioner's loan and the existence and content of
622   relevant documents. Additionally, Defendants breached their implied covenant of good faith and
623   fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
624   right under an alleged power of sale because the purported assignment was not recorded and by
625   willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
626   special relationship inherent in a real estate transaction between Agent and borrower, *and* all
627   Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

ORIGINAL PETITION                                                    22 of 24

628    ***CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET***
629    ***SEQ***

630    Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
631    contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
632    Action as though the same were set forth herein.

633    Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
634    the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
635    Property, and entitles Petitioner to damages as proven at trial.

636    ***INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS***

637    The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
638    highly leveraged and vulnerable consumers who placed their faith and trust in the superior
639    knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
640    civilized society.

641    Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
642    distress, or acted in conscious and/or reckless disregard of the probability that such distress
643    would occur.

644    Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
645    conduct of Defendants as described hereinabove.

646    As a result of such severe emotional distress, Petitioner suffered economic and non economic
647    harm and detriment, all to be shown according to proof at trial of this matter.

648    Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
649    Petitioner and secure to Petitioner quite title;

650    Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
651    as payments to Defendants based on the fraudulently secured promissory note in an amount to be
652    calculated by Defendants and verified to Petitioner;

653    Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
654    amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
655    equal to $2,278,568.01

ORIGINAL PETITION                                                23 of 24

656                                **PRAYER**

657    WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,
658    as follows:

659            For an emergency restraining order enjoining lender and any successor in interest from
660            foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth
661            herein;

662            For a permanent injunction enjoining Defendants from engaging in the fraudulent,
663            deceptive, predatory and negligent acts and practices alleged herein;

664            For quiet title to Property;

665            For rescission of the loan contract and restitution by Defendants to Petitioner according
666            to proof at trial;

667            For disgorgement of all amounts wrongfully acquired by Defendants according to proof
668            at trial;

669            For actual monetary damages in the amount $759,522.67;

670            For pain and suffering due to extreme mental anguish in an amount to be determined at
671            trial.

672            For pre-judgment and post-judgment interest according to proof at trial;

673            For punitive damages according to proof at trial in an amount equal to $2,278,568.01.

674            For attorney's fees and costs as provided by statute; and,

675            For such other relief as the Court deems just and proper.

676    **Respectfully Submitted,**
677
678    _Terri Ann Tate_
679        **Terri Ann Tate**

ORIGINAL PETITION                                                    24 of 24

Terri Ann Tate
38658 Mystic Court
Farmington Hills , MI 48331

Defendants, in the action by Plaintiff in the instant motion for a temporary restraining order, initiated foreclosure actions against Plaintiff without demonstrating that:

- o   the alleged real party in interest, for whom defendant claimed to act as agent, is in fact a true party in interest in the promissory note alleged by defendant;.

- o   defendant is in fact a proper agent for the real party in interest to the alleged promissory note;

- o   that the real party in interest held a valid lien against the property;

- o   that defendants had complied with all relevant laws.

Plaintiff has no knowledge that defendant is a proper agent for the alleged real party in interest and has no knowledge that the entity claiming to be the real party in interest, has a valid claim against the property on which defendant is attempting to foreclose.

Defendant has reason to believe that, immediately after Plaintiff signed a promissory note and a lien document providing a lien against the property in question, the lender to whom the lien was granted, traded the promissory note to a third party. In as much as the lien was not transferred to that same party, the lender still held a lien. Plaintiff alleges that, the lender accepted consideration in exchange for the promissory note created by Plaintiff. In as much as lender accepted the offered consideration, lender was compensated and could no longer be harmed by any failure on the part of Plaintiff to comply with the provisions of the promissory note, thus rendering the lien held by defendant unenforceable. Further, in as much as the purchaser of the promissory note accepted the note in exchange for consideration provided to the lender, the transaction, once completed left the purchaser with a claim against the signatory of the promissory note, but no claim against the property.

It is further alleged that the lender retained the lien document in furtherance of a scheme to hold the lien for three years then file an Internal Revenue Service Form 1099a and claim the full amount of the lien as abandoned funds so that lender could receive consideration a second time. Later, after receiving consideration on the transaction twice, transferred the void lien to some third party who would then attempt to express said lien.

It is the position of Plaintiff that:

- • defendant has no claim against the property;

- • even if such standing could be demonstrated, the purported agent for the principal has failed to properly demonstrate agency in the instant matter;

- • even if such agency could be demonstrated, defendant has failed to abide by the provisions of the Serviceman's Civil Protection Act of 1940 and, thereby, is estopped by

41    UCC 3-501 from further collections and has no standing to invoke the subject matter

42    jurisdiction of the court

43

44    Respectfully,

45

46    Terri Ann Tate

JS 44 (Rev. 12/07)  **CIVIL COVER SHEET**  County in which action arose  Oakland

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Tate Terri A.
38658 Mystic Court
Farmington Hills, Michigan

**(b)** County of Residence of First Listed Plaintiff  Oakland
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

### DEFENDANTS
BAC Home Loans Servicing, LP
450 American Street
Simi Valley, CA 93065

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

Case:2:10-cv-13257
Judge: Lawson, David M.
MJ: Hluchaniuk, Michael
Filed: 08-17-2010 At 02:48 PM
CMP TATE V BAC HOME LOAN SERVICING
LP (EB)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)
- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP (For Diversity Cases Only)
|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☒5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

REAL PROPERTY
- ☐ 210 Land Condemnation
- ☒ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

230

TORTS
PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee
- ☐ 465 Other Immigration Actions

FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. 1601, et seq, 12 U.S.C. 2601 et. seq
Brief description of cause: TILA and RESPA violations, fraud and breach of fiduciary duty

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $    CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE    DOCKET NUMBER

DATE August 16, 2010

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY
RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

# PURSUANT TO LOCAL RULE 83.11

1.         Is this a case that has been previously dismissed?    ☐ Yes
                                                                                           ☒ No

    If yes, give the following information:

    Court: _____

    Case No.: _____

    Judge: _____

2.         Other than stated above, are there any pending or previously
        discontinued or dismissed companion cases in this or any other  ☐ Yes
        court, including state court? (Companion cases are matters in which  ☒ No
        it appears substantially similar evidence will be offered or the same
        or related parties are present and the cases arise out of the same
        transaction or occurrence.)

    If yes, give the following information:

    Court: _____

    Case No.: _____

    Judge: _____

Notes :